**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BOUSTEAD SECURITIES, LLC, AND SUTTER SECURITIES, INC., | ) ) ) | Case No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC. | ) ) ) | |
| Defendant. | | |

## COMPLAINT

### PRELIMINARY STATEMENT

1.      Market access decisions shape investor confidence and the integrity of U.S. capital markets. Transparent, rule-based membership determinations are the backbone of that confidence and efficient capital formation. When private regulators overreach, they distort competition and undermine the statutory framework Congress designed. In implementing the U.S. Securities and Exchange Commission's ("SEC") oversight of self-regulatory organizations, Congress recognized that preserving the integrity, fairness, and transparency of capital markets requires clear, coordinated regulatory responsibilities, ensuring that self-regulatory organizations complement, rather than conflict with, the statutory framework and SEC authority.

2.      In this lawsuit, Plaintiffs Boustead Securities, LLC, and Sutter Securities, Inc. (collectively, the "Companies"), seek declaratory and monetary relief due to Defendant Financial Industry Regulatory Authority's ("FINRA") ultra vires conduct, where FINRA's agents acted outside the scope of the self-regulatory organization's authority delegated to it under the Exchange Act of 1934 (the "Exchange Act").

3.      In dealing with the Companies, FINRA crossed the line from regulator to overly

abusive market gatekeeper. Despite SEC-approved plans that reserved Nasdaq membership decisions exclusively to Nasdaq, FINRA told the Companies – and Nasdaq – that FINRA decides who gets "waived-in" the exchange. None of these acts constituted bona fide regulation; they were retaliatory commercial power exercised by FINRA, through its agents, without delegated authority.

4.     In early 2024, FINRA's Department of Enforcement conveyed to Nasdaq that Boustead faced a nebulous "regulatory matter," and Nasdaq promptly refused to approve any IPO with Boustead as underwriter immediately thereafter, even as FINRA's Corporate Finance Department was issuing no-objection letters clearing Boustead to underwrite other offerings. Those two positions cannot both be true, and FINRA's internal inconsistency is one example of its ultra vires conduct.

5.     When the SEC approved the July 2024 amendment to the Rule17d-2 Plan between Nasdaq and FINRA, it could not have been clearer: "FINRA ***shall not review*** the membership application … and shall not review applications … to request a change in the rights or status" of Nasdaq members.[1] FINRA nevertheless told the Companies that it had the ultimate authority and had already coordinated with Nasdaq to ensure the exchange deny the Companies' applications if FINRA said so.

6.     The Companies relied on FINRA's threats to their detriment and were forced to withdraw their Waive-In Applications, at FINRA's insistence, to avoid a public black mark that would result from the disclosure of denied applications. A year later, Nasdaq confirmed what the SEC's release already said: FINRA's role was solely administrative – to gather and pass along documents – and Nasdaq alone retained authority to approve or deny membership applications. It

---

[1] Unless otherwise stated, emphasis is added, citations and brackets are omitted, and quotations are cleaned up.

was then that the Companies learned from Nasdaq that they had been misled into surrendering millions of dollars in underwriting revenue as a result of being fraudulently coerced into withdrawing their Nasdaq applications.

7.     The harm was immediate and concrete. The Companies lost opportunities to serve as the sole and exclusive lead underwriter in their IPO engagements and other offerings that would have closed with the Companies but for FINRA's interference. Sutter was stalled out of Nasdaq for months before being approved on a materially identical resubmission, underscoring how FINRA's earlier story was a lie, and that Nasdaq would have approved all along.

8.     Undoubtedly, FINRA will say these were "regulatory communications." But the SEC's 17d-2 Plans allocate who does what. Membership and listing eligibility are Nasdaq's functions, not FINRA's. When FINRA tells Nasdaq whom to admit – or effectively tells a member "withdraw or we'll make sure Nasdaq denies you" – it is acting outside its delegated authority and is not entitled to immunity for that conduct.

9.     This case is not about second-guessing ordinary enforcement decisions or sanction-setting. The Companies accept that FINRA can investigate and bring cases against its members, even if brought in bad faith or with retaliatory animus. FINRA cannot, however, dictate exchange membership outcomes or participation, or weaponize false "regulatory matter" claims to coerce settlements and cripple a member's business.

10.     Accordingly, the Companies seek a declaration that FINRA's interference with Nasdaq membership determinations is ultra vires under the SEC-approved 17d-2 Plans, an injunction barring further interference or misrepresentations to Nasdaq and the New York Stock Exchange – American (the "NYSE") about the Companies' supposed disqualification, and damages for fraud, misrepresentation, and tortious interference with contracts and prospective

business.

## PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff Boustead Securities, LLC ("Boustead") is a manager-managed limited liability company organized under California law, with its principal place of business located at 6 Venture, Irvine, California 92618. Each of Boustead's owners reside in California. Boustead is an investment banking broker-dealer that provides financial advisory services to clients on mergers and acquisitions, capital raises, and restructuring, including serving as an underwriter for initial public offerings ("IPOs") on U.S.-based listing exchanges, including Nasdaq and the NYSE. Boustead has been a registered member of FINRA since January 2007.

12.     Plaintiff Sutter Securities, Inc. ("Sutter") is a corporation organized under California law, with its principal place of business at 6 Venture, Irvine, California 92618. Sutter is also an investment banking broker-dealer, providing the same financial advisory services as Boustead. Sutter has been a registered member of FINRA since December 1992.

13.     Defendant FINRA is a private Delaware corporation and self-regulatory organization ("SRO") with its principal place of business located at 9509 Key West Ave., Rockville, Maryland 20850 (the "FINRA Rockville Office"). FINRA regulates broker-dealers in the United States and their associated persons for the purpose of protecting investors and ensuring market integrity.

14.     The Court has personal jurisdiction over FINRA, which maintains offices and conducts substantial, continuous business in this District, and because the causes of action arise from FINRA's commission of tortious acts within the State of Illinois.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the Companies and Defendant are of diverse citizenship and the amount in controversy exceeds

4

$75,000.

16.     Additionally, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the Companies seek a declaration of rights under, and this action requires construction of, SEC approved plans promulgated pursuant to the Exchange Act's Rule 17d-2. The 17d-2 Plans partition regulatory responsibilities between FINRA and Nasdaq. The Court has supplemental jurisdiction over the Companies' state law claims under 28 U.S.C. § 1367, because the federal and non-federal claims arise from a common nucleus of operative fact. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

17.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district because FINRA transacts business in this judicial district, and a substantial part of the events giving rise to the claims occurred here, including communications and decisions directed by FINRA personnel located in Chicago, Illinois.

**REGULATORY FRAMEWORK**

18.     On September 23, 2021, the SEC issued Release No. 34-93114, approving a Rule 17d-2 Plan among FINRA, Nasdaq, and Nasdaq BX, Inc. The Plan allocated regulatory responsibilities between these regulatory bodies to eliminate duplicative oversight of common members. Under this framework, FINRA assumed examination and enforcement duties for certain common rules and specified provisions of the Exchange Act, while Nasdaq retained authority over its own membership. The plan states:

> (d) … FINRA shall not review the membership application, reports, filings, fingerprint cards, notices, or other writings filed to determine if such documentation submitted by a broker or dealer, or a person associated therewith or other persons required to register or qualify by examination meets the Nasdaq or BX requirements for general membership or for specified categories of membership or participation in Nasdaq or BX, such as Equities Market Maker, Equities ECN, Order Entry Firm, or any similar type of Nasdaq or BX membership or participation that is created after this Agreement is executed.

5

86 Fed. Reg. 53996, 54000-54001 (Sept. 29, 2021) (the "September 2021 17d-2 Plan"). Accordingly, the September 2021 17d-2 Plan prohibits FINRA from determining or influencing Nasdaq membership decisions or IPO listing approvals.

19.     On July 15, 2024, the SEC issued Release No. 34-100536 approving and declaring effective an Amended Rule 17d-2 Plan among FINRA, Nasdaq, and Nasdaq BX, Inc. The amended rule reaffirmed FINRA's responsibility for surveillance and enforcement of certain common rules but expressly clarified that:

> FINRA shall not review the membership application, reports filings, fingerprint cards, notices, or other writings filed to determine if such documentation submitted by a broker or dealer, or a person associated therewith or other persons required to register or qualify by examination meets the Nasdaq or BX requirements for general membership or for specified categories of membership or participation in Nasdaq or BX, or any similar type of Nasdaq or BX membership or participation that is created after this Agreement is executed.

89 Fed. Reg. 58819, 58822 (July 19, 2024) (the "July 2024 17d-2 Plan", and collectively with the September 2021 17d-2 Plan, the "17d-2 Plans"). This release again underscores that Nasdaq, alone, is responsible for membership and listing determinations, and FINRA is not permitted to weigh in on or influence membership outcomes.

20.     Courts across the country routinely recognize that SROs like FINRA enjoy broad immunity from liability when performing "their regulatory, adjudicatory, or prosecutorial duties." *See e.g., In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 115 (D.C. Cir. 2008); *accord DL Capital Grp. LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97 (2d Cir. 2005) ("There is no question that an SRO and its officers are entitled to absolute immunity when they are, in effect, acting under the aegis of their regulatory duties."). However, SROs are not immune from suit when they act outside, or in direct contravention of, their statutorily delegated authority. *Weissman v. NASD*, 468 F.3d 1306, 1311 (11th Cir. 2006) ("Absolute immunity is not appropriate unless the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory,

or disciplinary function.") (collecting cases); *D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105 (2d Cir. 2001) ("an SRO, such as the New York Stock Exchange, may be entitled to immunity from suit for conduct falling within the scope of the SRO's regulatory and general oversight functions"); *In re Chi. Bd. of Options Exch. Volatility Index Manip. Antitr. Litig.*, 390 F. Supp. 3d 916, 929-30 (N.D. Ill. 2019) (holding that SROs are not immune from actions taken in their private capacity, noting that regulatory entities may also engage in non-governmental activities to serve their private business interests, and immunity extends only to the performance of an SRO's "delegated functions"); *Platinum Partners Value Arbitrage Fund, L.P. v. Chi. Bd. Options Exch.*, 105 N.E.3d 160, 172 (Ill. App. Ct. 2018) (articulating the standard that whether an "SRO's conduct falls within the scope of regulatory immunity is purely objective and that the subjective intent of the SRO is completely irrelevant," reversing lower court's finding that immunity applied based on the organization's private, selective disclosures).

### GENERAL ALLEGATIONS

21.     From August 2022 through December 2023, FINRA conducted a lengthy regulatory examination and investigation into the Companies. Throughout the investigation, the Companies have responded to numerous requests from FINRA to produce documents and/or information, where at least 20 different Boustead representatives sat for on-the-record interviews and the Companies produced millions of pages of documents in response to FINRA's inquiries.

22.     The examination and investigation into the Companies was primarily handled by Jena Levin ("Levin"), a member of the Department of Enforcement at FINRA and who operates out of the FINRA Office located at 55 W. Monroe St., Suite 2600, Chicago, Illinois 60603, and Miki Tesija ("Tesija"), also a member of the FINRA's Department of Enforcement, who operates out of the FINRA Rockville Office.

23. Until yesterday, FINRA had not filed a complaint or brought an enforcement proceeding against the Companies. However, in July 2024, FINRA contacted the Companies about the status of the investigation and negotiation of a resolution to the examination and investigation through the possibility of the Companies paying FINRA monetary damages. FINRA is permitted to discipline members and typically imposes sanctions on its members by considering FINRA's Sanctions Guidelines.

24. The Companies – and the industry at large – rely on FINRA's Sanctions Guidelines to inform their compliance procedures and to understand the rules for which FINRA scrutinizes and imposes sanctions.[2] Through the Companies' discussions with Levin and Tesija, FINRA consistently demanded that the Companies collectively pay sanctions up to 20 times greater than what the Sanctions Guidelines provide. When confronted with the discrepancy between FINRA's demands and the Sanctions Guidelines, Levin and Tesija represented that they were not obligated to comply with the Sanctions Guidelines, and proceeded to make numerous threats about pursuing enforcement proceedings against the Companies and several of their individual registered representatives if the Companies did not agree to FINRA's demands, or if the Companies continued to demand a resolution within the scope of FINRA's Sanctions Guidelines.

25. On at least a few different occasions, representatives of FINRA's Enforcement Department handling the investigation stated that if the Companies take issue with the sanctions demands that FINRA proposed, the Companies could instead de-register with FINRA and cease their business.

---

[2] *See* FINRA Sanctions Guidelines (March 2024) at 1 (stating that "FINRA has published the FINRA Sanctions Guidelines so that member firms, associated persons, and their counsel may become more familiar with the types of disciplinary sanctions that may be applicable to various violations. FINRA staff and respondents also may use these guidelines in crafting settlements."), available at https://www.finra.org/sites/default/files/Sanctions_Guidelines.pdf (last accessed January 15, 2026).

26.     Upon information and belief, FINRA's Department of Enforcement and its staff maintain a culture of routinely attempting to maximize settlement amounts and/or sanctions for rule violations in exchange for prosecutorial bragging rights and intra-company kudos. Sometimes, this culture translated into a desire of Department of Enforcement staff to ratchet up pressure on its members in any way that they can in order to extract higher sanctions.

27.     In addition, and upon information and belief, some members of FINRA's Department of Enforcement staff prolong investigations and enforcement proceedings so respondents incur exorbitant legal fees, to the point that referrals from the Division of Examinations to the Department of Enforcement take years to resolve, with the byproduct being the increase of settlement leverage on the broker-dealers under scrutiny. Accordingly, FINRA oftentimes extracts settlement amounts disproportionate to its Sanctions Guidelines, because broker-dealers stem the tide of legal fees in exchange for a negotiated resolution to alleged rule violations.

28.     The Companies recognize that the Department of Enforcement's securing of sanctions for alleged violations of FINRA rules is conduct that falls within FINRA's delegated authority under the Exchange Act. While the Companies believe that FINRA's, Levin's, and Tesija's settlement posture is, in essence, a bad-faith regulatory hold up, the Companies nonetheless recognize that being subjected to aggressive, zealous settlement demands from FINRA's Department of Enforcement staff is something that, when performed *exclusively* in the context of resolving a FINRA examination and enforcement proceeding, falls within the scope of FINRA's delegated powers and the SRO's right to discipline its members.

29.     However, Levin, Tesija, and the Department of Enforcement's conduct crossed the line from aggressive settlement posturing to ultra vires and tortious acts.

30. In November 2022, Boustead was engaged by Metros Development Co. Ltd. ("Metros") to act as its exclusive financial advisor on all financings and transactions during the 18-month term and for another 12 months after, including as underwriter for Metros' anticipated IPO. According to Boustead's engagement letter with Metros, Boustead is only compensated for its work upon successful financings, including an IPO; if Metros did not close on its IPO, Boustead would not get paid for any of its services.

31. As Metros' exclusive financial advisor and underwriter, Boustead spent a significant amount of time – approximately 15 months – working with Metros to position the company to be ready for an IPO in or around the first quarter of 2024.

32. On January 23, 2024, FINRA issued a "no objection" letter in which it confirmed that FINRA's Corporate Finance Department had approved Boustead to serve as the underwriter for Metros' anticipated IPO. Between the commencement of FINRA's investigation in November 2022 and Boustead's receipt of this "no objection" letter, Boustead successfully served as an underwriter on ten different IPOs and one secondary offering on the Nasdaq. For each of the eleven IPOs, Boustead received "no objection" letters from FINRA's Corporate Finance Department.

33. On February 22, 2024, Benjamin Haskell, the Associate Vice President and Head of U.S. Initial Listings and Structured Products at Nasdaq, called a then-junior banker at Boustead, Brinston Lingenfelter, and advised Mr. Lingenfelter that Nasdaq would not allow the Metros IPO to close because of a "regulatory matter" involving Boustead that disqualified it from acting as an underwriter for the Metros IPO.

34. After learning of Mr. Haskell's call to Mr. Lingenfelter, Boustead's representatives, Lincoln Smith and Christopher Parrington, contacted Zina Howell, a FINRA Member Supervision and Risk Monitoring Analyst, to ask if FINRA had commenced any "regulatory matter" against

Boustead, to which Ms. Howell responded that FINRA had no open regulatory matters involving Boustead.

35.     On February 27, 2024, Boustead had another call with Mr. Haskell to further inquire about the purported "regulatory matter" that was preventing Nasdaq's approval of the Metros IPO. Mr. Haskell responded that he could not provide any further information other than that Nasdaq received information from someone else stating that the Metros IPO should not be approved with Boustead as an underwriter because of a "regulatory matter" involving Boustead. Mr. Haskell did not provide the source of this information during this call.

36.     Between February 27 and March 4, 2024, Boustead conducted an internal investigation to determine if any "regulatory matter" had commenced against it by any regulatory authority. No such matter was discovered.

37.     On March 4, 2024, Boustead had a third call with Mr. Haskell, who finally informed Boustead that "someone at FINRA" had contacted Nasdaq and advised the exchange that it should not approve the Metros IPO with Boustead serving as the underwriter because of a "regulatory matter" involving Boustead. As a result, Mr. Haskell advised Boustead that Nasdaq decided that from the day it received the call about the purported "regulatory matter," until the "regulatory matter" was resolved, Nasdaq would not approve any IPOs in which Boustead would act as an underwriter, despite Boustead's receipt of "no objection" letters from FINRA's Corporate Finance Department for every IPO in which it had been engaged as an underwriter.

38.     On the same day, Boustead contacted the Office of the Ombudsman at FINRA to ask if there was a pending "regulatory matter" at FINRA involving Boustead. The Ombudsman's office responded that it would investigate and contact Boustead when it knew more.

39.     On March 7, 2024, Boustead had a fourth call with Mr. Haskell to explore a

potential resolution of Nasdaq's decision not to approve any IPOs on which Boustead was expected to serve as an underwriter. Boustead proposed that it transfer a majority of its potential investor accounts for the Metros IPO to another broker-dealer. Mr. Haskell responded that such a proposal would not resolve the issue, and Nasdaq would still not approve any IPOs, including the Metros IPO, in which Boustead acted in any underwriting capacity because of FINRA's representation that Boustead was the subject of a "regulatory matter."

40. On March 13, 2024, the Office of the Ombudsman at FINRA contacted Boustead and confirmed that as a result of its investigation, it was not aware of any "regulatory matter" involving Boustead at FINRA, nor was it aware of anyone at FINRA who was responsible for reviewing and approving underwriters on pending IPOs to notify Nasdaq of a pending "regulatory matter" that would disqualify Boustead, or any affiliated broker-dealer such as Sutter, from acting as an underwriter.

41. Upon information and belief, the individuals at FINRA who made the representation to Mr. Haskell that Boustead was subject to a "regulatory matter" were Levin and/or Tesija, or another member of FINRA's Department of Enforcement handling the Companies' examination and enforcement referral under Levin and Tesija's authority and supervision.

42. Upon information and belief, the representation was transmitted because of the Companies' reluctance to settle, at an exorbitant cost to the Companies, the examination and investigation matter handled by Levin and Tesija.

43. Upon information and belief, Levin, Tesija, and/or another member of FINRA's Department of Enforcement acted beyond FINRA's delegated authority and in contravention of the September 17d-2 Plan by urging Nasdaq to reject any IPOs underwritten by Boustead, and falsely asserting that Boustead was *disqualified* from Nasdaq participation due to a purported

"regulatory matter." These communications were not part of FINRA's examination or enforcement responsibilities under the September 17d-2 Plan. That Plan allocated to Nasdaq – not FINRA – the authority to determine membership and listing eligibility. By attempting to and successfully dictating Nasdaq's treatment of Boustead, Levin and/or Tesija effectively usurped Nasdaq's exclusive role and contravened the regulatory framework established and approved by the SEC.

44. On March 18, 2024, after Levin, Tesija, and/or another member of FINRA's Department of Enforcement staff informed Nasdaq that it should not approve any IPOs for which Boustead would serve as an underwriter, FINRA's Corporate Finance Department issued additional "no objection" letters to Boustead. For example, Boustead served as the underwriter for the IPO of CleanCore Solutions, Inc. (ZONE) on the NYSE (the "ZONE IPO"), which ultimately closed in April 2024. This approval from FINRA's Corporate Finance Department underscores that if Boustead was truly the subject of a "regulatory matter" precluding it from underwriting IPOs, then FINRA's Corporate Finance Department would not have approved Boustead as the lead underwriter for the ZONE IPO.

45. Accordingly, as of April 1, 2024, no "regulatory matter" involving the Companies existed precluding Boustead or Sutter from serving as a FINRA-registered broker-dealer and underwriter of IPOs.

46. On or around April 15, 2024, Nasdaq re-confirmed, via correspondence from Joanne Pedone, Principal Associate General Counsel at Nasdaq, to Boustead that certain individuals at FINRA, without specifying who, informed Nasdaq that there was a "regulatory matter" involving Boustead.

47. On April 24, 2024, Boustead had another conference call with Nasdaq regarding Boustead's "regulatory matter", where Mr. Haskell reported that Nasdaq had a solution to

Boustead's prohibition of underwriting activities. At this time, Nasdaq informed Boustead that the solution was that beginning on May 14, 2024, Nasdaq would require all broker-dealers desiring to serve as an underwriter for Nasdaq IPOs to become members of Nasdaq pursuant to a soon-to-be-released membership application. According to Nasdaq, the application was a simple waive-in application.

48. Following this call, the Companies prepared applications to become limited underwriting members, as recommended by Nasdaq's representatives.

49. After the membership application was released, the Application Form contemplated four different types of membership applications: an Initial Nasdaq Application; an Amendment; a Full Membership; and a Waive-In Membership, where the latter was limited to underwriting memberships for applicants who were members of at least one Nasdaq-affiliated exchange or FINRA at the time of the application and wished to serve as underwriters of IPOs.

50. On April 29, 2024, Sutter submitted its application for a Waive-In Membership with Nasdaq based on its status as a FINRA member. On June 3, 2024, Boustead submitted its application for a Waive-In Membership on the same grounds (collectively referenced as the "Waive-In Membership Applications").

51. On June 12, 2024, the Companies received notice from Edward Monti at FINRA, a Principal Analyst in the Membership Application Program at FINRA, that FINRA was asking for answers to specific questions regarding the Waive-In Membership Applications submitted to Nasdaq.

52. On June 15, 2024, the Companies submitted responses to FINRA's questions.

53. Two days later, Monti acknowledged receipt of the Companies' responses and requested an extension until July 17, 2024, for Nasdaq to make a decision on the Waive-In

Membership Applications. The Companies responded immediately, agreeing to Monti's requested extension and stated that they hoped to receive a response soon, given that some of the Companies' clients hoped to list on Nasdaq soon.

54. On or about June 28, 2024, the Companies were again contacted by Monti to schedule a call to discuss their Waive-In Membership Applications.

55. On July 3, 2024 – two days after FINRA entered into the SEC-approved July 2024 17d-2 Plan expressly disclaiming any authority to review Nasdaq membership applications – the Companies participated in a call with Monti and others at FINRA. During this call, Monti stated that Nasdaq was deferring all waive-in membership application decisions to FINRA and that FINRA had the sole and ultimate authority to approve or deny such applications. Monti further advised that FINRA intended to object to the Companies' Waive-In Membership Applications and had already communicated with Nasdaq, who according to Monti, agreed to deny the applications if FINRA recommended their denial. These statements conveyed that FINRA controlled Nasdaq's membership determinations, in direct contraction of the 17d-2 Plans' mandate that FINRA "shall not review" or determine whether a broker-dealer meets Nasdaq's membership requirements.

56. FINRA's assertion of blanket authority to approve or deny waive-in membership applications was ultra vires and in violation of the Exchange Act and the SEC's allocation of responsibilities under the Regulatory Services Agreement between Nasdaq and FINRA. By dictating Nasdaq's membership decisions, FINRA usurped a function reserved exclusively to Nasdaq and acted outside the scope of any delegated regulatory authority. In fact, Monti acted in direct contravention of the 17d-2 Plans.

57. In addition, FINRA falsely represented to the Companies that Nasdaq had granted FINRA full authority to determine which FINRA members would be admitted as Nasdaq limited

underwriting members. FINRA further falsely represented that FINRA had already decided to object to the Companies' Waive-In Membership Applications, despite both firms being in good standing with FINRA; despite Boustead receiving numerous prior (and subsequent) no-objection letters from FINRA's Corporate Finance Department authorizing it to serve as underwriter for its clients' IPOs; and despite not being subject to any proceedings that could result in suspension or revocation of their FINRA memberships. These misrepresentations were material and were made to induce the Companies to withdraw their Waive-In Membership Applications, in direct contrast to the SEC-approved 17d-2 Plans, which expressly prohibited FINRA from reviewing or determining Nasdaq membership qualifications.

58.     According to Monti and the other FINRA representatives on the call, FINRA stated that it would not formally communicate its objections to Nasdaq, which would result in a denial of the Companies' applications, if the Companies voluntarily withdrew their Waive-In Applications. If the Companies did not withdraw their Waive-In Applications, Monti stated that when Nasdaq's denial occurred, that denial would become a disclosable event that must be reported on the Companies' public records, including each Companies' Form BD. Monti further forecasted that such a disclosable event would have a significant impact on the Companies' future business.

59.     On the July 3rd call, neither Monti nor the other FINRA representatives notified the Companies of the 17d-2 Plans and FINRA's agreement not to interfere with Nasdaq's decision-making on membership applications submitted by broker-dealers.

60.     Relying on the threatening and false statements made by Monti and FINRA during the July 3rd call, the Companies notified Nasdaq that they withdrew their Waive-In Applications because of FINRA's representations.

61. Because Monti and FINRA omitted any mention that Nasdaq's membership decisions were exclusively *Nasdaq's* prerogative, the Companies had no choice but to withdraw their Waive-In Applications to mitigate the damage that would result from the required disclosure if their Waive-In Applications were denied. But for Monti and FINRA's representations and threats, the Companies would not have withdrawn their Waive-In Applications and would have been granted limited underwriting membership with Nasdaq in July 2024, based on Nasdaq's own "solution" that the Companies apply for membership in the first instance.

62. Since February 2024, FINRA's Corporate Finance Department approved Boustead's underwriting for several IPOs on the NYSE, including the Zone IPO in April 2024, the Kairos Pharma, Ltd. (KAPA) IPO in September 2024, and Everfront Biotech Holding Co. Ltd., which has yet to close on its IPO. If Boustead was truly subject to a "regulatory matter" as Levin, Tesija, and/or other members of FINRA's Department of Enforcement staff represented, then FINRA's Corporate Finance Department would not have approved Boustead as an underwriter for *any* of the aforementioned IPOs.

63. At all relevant times, FINRA, Levin, Tesija, Monti, and others knew, or should have known, that the majority of Boustead's business included IPO listings on Nasdaq, and knew that by falsely informing Nasdaq that Boustead was the subject of a "regulatory matter" and falsely representing that FINRA and Nasdaq agreed to deny the Waive-In Applications, it would significantly harm the Companies' ability to continue operating as an underwriter of IPOs.

64. Between July 2024 and February 2025, numerous other FINRA-registered broker-dealers became limited underwriting members with similar (or in some instances, worse) regulatory backgrounds and pursuant to applications similar to the Companies' Waive-In Applications. In contrast to the Companies, some broker-dealers had regulatory histories with

17

numerous and significant disclosable events yet were nonetheless waived-in as limited underwriting members of Nasdaq.

65. In February 2025, Sutter participated in a telephone call with Monti, who recommended that the Companies resubmit Nasdaq membership applications as a result of Nasdaq's grant of membership to other FINRA-registered broker-dealers with more numerous and significant disclosable events and regulatory infractions. Upon information and belief, the only reason Monti made this suggestion was because he belatedly recognized that his and FINRA's prior interference with the Companies' applications violated the SEC's mandate that FINRA was not supposed to be involved in Nasdaq's application and review process.

66. On or about February 13, 2025, Sutter submitted an application that was almost identical to its prior application for Nasdaq membership. At this point, the Companies were unaware of any resolution to the "regulatory matter" that previously hamstrung their participation in and membership efforts with Nasdaq.

67. Thereafter, Sutter received numerous requests from FINRA for documents and other information for review and consideration of the 2025 Applications, similar to the process employed in connection with the Companies' prior Waive-In Applications. Between February and April 2025, Sutter provided detailed responses to FINRA's requests, which were nearly identical to the requests FINRA made in connection with Sutter's previous waive-in application the year prior.

68. In or around June 2025, Sutter was contacted by Nasdaq regarding its 2025 Application. Shortly thereafter, Sutter participated in a telephone call with Nasdaq regarding the status of its resubmitted application. During that call, Sutter asked Nasdaq's representatives about FINRA's involvement regarding its 2025 Application and FINRA's anticipated recommendation,

18

as occurred in 2024, that Nasdaq deny its 2025 Application because the pending "regulatory matter" had not been resolved. Sutter also asked whether the prior year's procedure was the same for its 2025 Application, namely, whether Nasdaq would defer to FINRA on all waive-in applications and if FINRA recommended denial of Sutter's 2025 Application.

69. Nasdaq's representatives stated in response that FINRA's involvement in the application process was administrative, simply to gather and provide documentation to Nasdaq for *Nasdaq's* review and consideration of Sutter's 2025 Application and all other waive-in applications. Nasdaq's representatives also stated that FINRA did not make recommendations or otherwise have a governmental function or ability to influence Nasdaq's decisions on applications to Nasdaq. Nasdaq's representatives further stated that *Nasdaq* retained the sole authority to approve or deny waive-in applications, regardless of FINRA's opinion.

70. Nasdaq's revelation was stunning to the Companies because Nasdaq's statements directly contradicted FINRA's prior representations from a year earlier. FINRA had insisted that Nasdaq agreed to deny waive-in applications based solely on FINRA's recommendation and that the Companies' withdrawal was the only way to avoid a publicly damaging denial. Nasdaq's confirmation that FINRA's role was purely administrative – and that Nasdaq alone retained exclusive authority to approve or deny applications – exposed to the Companies that FINRA's earlier statements were false and misleading, at best. And the Companies had withdrawn their applications in reliance on those misrepresentations by FINRA, forfeiting critical business opportunities and millions in underwriting fees they otherwise would have earned as lead underwriter in their clients' Nasdaq IPOs.

71. On June 26, 2025, Sutter's 2025 Application was approved, and Sutter became a limited underwriting member of Nasdaq. Sutter's 2025 Application was nearly identical to the

application it submitted a year prior.

72.     The approval of Sutter's 2025 Application made it clear that FINRA lied to the Companies to convince them to withdraw their Waive-In Applications under false pretenses and in reliance upon FINRA's representations that directly contradicted the terms of the September 2021 and July 2024 17d-2 Plans.

73.     Upon information and belief, FINRA lied to the Companies in order to use the Companies' inability to become Nasdaq members and inability to serve as lead underwriter of its clients' IPOs as leverage to coerce the Companies into paying sanctions amounts to resolve the pending enforcement referral. But had the Companies known the truth, they never would have withdrawn the Waive-In Applications and would have been lead underwriters for several IPOs since the summer of 2024 including, without limitation, the following clients who had executed engagement agreements with the Companies: Metros Development Co., Ltd.; Zerospo; Maverick Lifestyle, Inc.; Gelteq Pty Ltd.; Acesis BioMed Ltd.; Unifoil Corporation; Turbo Energy, S.L.; 3E Network Technology Group Limited; rYojabab, Inc.; Libera Gaming Operations, Inc.; Boustead APEX, Inc. f/k/a Boustead Wavefront, Inc.; and Xiamen Kuangshi Alliance Network Technology Co., Ltd.

74.     After the July 4th holiday and only a few weeks after Sutter became a Nasdaq limited underwriting member, Levin contacted the Companies and advised that FINRA would be issuing a Wells Notice to Keith Moore, the former CEO and current board member and owner of the Companies. Such a Wells Notice would constitute an expansion of the scope of the referral to the Department of Enforcement from FINRA's Division of Examinations, and contrary to previous representations made by Levin that Mr. Moore would not be the subject of an enforcement proceeding. Upon information and belief, this outreach was made because Levin, Tesija, and/or

20

other members of FINRA's Department of Enforcement felt like they had lost settlement leverage as a result of Sutter being granted a limited underwriting membership with Nasdaq and attempted to ratchet up the pressure on the Companies.

75.     On July 8, 2025, just a few weeks after Sutter's 2025 Application was approved, Boustead resubmitted its waive-in application for a limited underwriting membership with Nasdaq, which was almost identical to the application previously submitted by Sutter. Unlike Sutter's 2025 Application, FINRA did not request documents or other information for review and consideration of Boustead's 2025 Application.

76.     Instead, on July 22, 2025, Nasdaq contacted Boustead and held a conference call with representatives from Nasdaq's membership department, Erik Whittman, Esq., and Susan Murray. Mr. Whittman advised Boustead that without reviewing anything other than Boustead's 2025 Application, Nasdaq had already made a preliminary determination to reject Boustead's 2025 Application. When pressed for answers, Mr. Whittman initially stated that he was "not inclined to explain why" Nasdaq made that determination.

77.     In late August 2025, Boustead's representatives had another call with Mr. Whittman and Ms. Murray, where Nasdaq maintained its position that it would not approve Boustead's 2025 Application. Boustead asked Mr. Whittman whether Nasdaq's determination was based upon information or requests from FINRA. Mr. Whittman responded that he was not able to comment on any communications that he, or anyone else at Nasdaq, may have had with FINRA about Boustead's 2025 Application.

78.     It was clear to Boustead's representatives that based on Mr. Whittman's tone, tenor, and demeanor during the conference call, that he was hiding something. Boustead's representatives left the call understanding that Mr. Whittman was not speaking truthfully in response to Boustead's

21

question about Nasdaq's communications with FINRA regarding its 2025 Application and that he was evasive and visibly uncomfortable when answering the Companies' questions about communications between FINRA and Nasdaq that resulted in Nasdaq's decision to deny Boustead's application.

79.     Upon information and belief, Mr. Whittman was hiding the fact that either Levin, Tesija, or others at FINRA contacted Mr. Whittman and/or others at Nasdaq, in an attempt to influence Nasdaq to reject Boustead's 2025 Application, which was also nearly identical to Sutter's 2025 Application that the Nasdaq, weeks before, had just approved.

80.     Upon information and belief, there is no justifiable reason why Nasdaq would approve Sutter's 2025 Application and weeks later, turn around and reject Boustead's 2025 Application, unless Nasdaq had been instructed to do so by Levin, Tesija, or someone else at FINRA in retaliation and part of the same effort to coerce Boustead and Sutter to concede to FINRA's unreasonable sanctions demands.

81.     FINRA's statements and threats went beyond any permissible review and usurped Nasdaq's exclusive authority to determine membership status, in direct contravention of the 17d-2 Plans. The Rule 17d-2 Plans' prohibition on FINRA reviewing applications to determine compliance necessarily precludes FINRA from dictating approval or denial of Nasdaq's membership decisions.

82.     As a result of FINRA fraudulently representing to Nasdaq that there was a "regulatory matter" involving the Companies, Nasdaq has not approved any IPOs where Boustead served as an underwriter since December 2023. Based on FINRA's false assertions to Nasdaq, Boustead was forced to terminate its engagement agreement with Metros for the Metros IPO, losing more than $1 million in commissions it would have otherwise earned for its work.

22

83. FINRA's representations to Nasdaq that there was a "regulatory matter" involving the Companies disqualifying them from Nasdaq membership was ultra vires conduct by FINRA and in direct violation of the 17d-2 Plans.

84. As a result of FINRA fraudulently representing to the Companies that Nasdaq was going to deny their Waive-In Applications at FINRA's request, the Companies have been unable to act as a lead underwriter for any of their clients' IPOs since September 2024. FINRA's underhanded efforts to influence Nasdaq to deny Boustead's 2025 Application was, similarly, ultra vires conduct by FINRA and in direct contravention of the 17d-2 Plans. For over a year, Boustead was forced by FINRA to allow many other clients to engage another broker-dealer to serve as an underwriter in their clients' IPOs on Nasdaq. In each of these instances, Boustead was forced to surrender fees it would have otherwise earned, had it been a member of Nasdaq and allowed to be the sole underwriter for its clients' IPOs, causing Boustead to lose at least $5 million in revenue because of FINRA's ultra vires conduct.

85. On July 7, 2025, the NYSE began implementing a new rule, similar to the Nasdaq rule, which requires broker-dealers to be members of NYSE to underwrite IPOs on that exchange.

86. In light of the Companies' history of underwriting IPOs on the NYSE, as well as the Nasdaq, and considering Sutter's membership in Nasdaq, on August 6, 2025, Sutter submitted a limited underwriting member application to NYSE.

87. Despite submitting its application on August 6, 2025, for at least two months, Sutter received no communications from NYSE regarding its application including, without limitation, any requests for information for NYSE's consideration in connection therewith. As a result, on October 8, 2025, Sutter sent an email to NYSE asking for an update on the status of its limited underwriting member application, to which NYSE responded by stating that "[i]t looks like the

23

application is still under review with the NYSE regulation team, if there is any update I will notify you right away."

88.     On October 13, 2025, after no further communications from NYSE including requests for information in connection with Sutter's pending application, NYSE sent an email to Sutter, stating that "[a]fter *FINRA* and NYSE Regulation's review of the firm's pending Limited Underwriting Application for NYSE and NYSE American Equities, *NYSE is unable to issue a no objection to this Application*." The NYSE's email further stated that "[w]e recommend you send an email requesting withdrawal of the Application at this time," similar to FINRA's instructions to Boustead and Sutter in response to their first limited underwriting member applications with the Nasdaq.

89.     On October 23, 2025, Sutter responded to the NYSE's denial of its application with an email asking for clarification on the NYSE's decision including the basis for the denial; whether the denial was based upon Sutter's failure to satisfy any specific conditions for membership; what input FINRA provided in reviewing the application and the NYSE's decision to deny the application; who at FINRA was involved in the review of Sutter's application and the decision-making process; whether there were any specific concerns or requirements that FINRA presented to the NYSE that influenced the denial decision; and whether Sutter has an ability to request reconsideration depending on its answers to the other questions.

90.     On October 24, 2025, Tiffany Buxton, Director of NYSE Regulation, responded to Sutter's email by stating that NYSE's decision to deny Sutter's application was based upon "the Exchanges' review of the firm's open regulatory matters, including but not limited to FINRA Matter No. 20220751859," which is the investigation conducted by Levin and Tesija.

91.     Upon receipt of Ms. Buxton's October 24th email, Sutter sent another email asking

NYSE to identify the specific individuals at FINRA with whom NYSE had discussed Sutter's pending application and resulted in the NYSE's decision to deny, to which Ms. Buxton responded that it was "the FINRA Enforcement team handling the specific FINRA matter referenced below," which is Levin and Tesija.

92.     As a result of Sutter's communications with the NYSE in connection with its pending limited underwriting member application, FINRA's Department of Enforcement, through Levin and Tesija, are not just acting in a regulatory capacity, but are engaging in ultra vires conduct to interfere with the Companies' business by causing Nasdaq and the NYSE to deny the Companies' limited underwriting member applications, thereby interfering with the Companies' current contractual engagements and client relationships. This is because, upon information and belief, the Companies refuse to concede to Levin and Tesija's extortionist demands to pay more than required under the Sanctions Guidelines to resolve their pending investigation.

93.     Compared to similarly situated broker-dealers, the Companies have built strong reputations as rule-compliant and abiding FINRA members, where Boustead and Sutter each have one regulatory-related disclosure event identified on their broker check reports in over 50 combined years as FINRA members. These reputations have historically permitted the Companies to earn the trust of their clients, who in turn expect the financial advisory service providers and broker-dealers they choose to work with to maintain pristine regulatory reputations and rule-compliant practices.

94.     The Companies are established broker-dealers that regularly act as underwriters and distribution participants for U.S.-based IPOs. The Companies' ability to secure and close underwriting engagements depends on accurate exchange member status, timely approvals, and the absence of unfounded "red flags" communicated to exchanges.

25

95.     To date, the Companies are subject to routine regulatory examinations but are *not* subject to any investigation or enforcement proceedings brought by FINRA. As a result, the Companies remain members in good standing with FINRA, the SEC, and all applicable state-level securities regulators.

96.     Remarkably, FINRA's dishonesty vis-à-vis the Companies did not end with the actions described above. Instead, and as described in detail below, after receiving a draft of this Complaint in November 2025, FINRA made a series of false statements to the Companies to induce them not to file this Complaint under the guise of giving FINRA time to investigate and attempt to remedy the wrongs identified herein. But FINRA never intended to investigate or address these allegations, and its leadership was merely buying time to commence a retaliatory enforcement action against the Companies.

97.     On or about November 21, 2025, the Companies, through their legal counsel, sent correspondence (the "November 21st Letter") to Robert W. Cook, Chief Executive Officer of FINRA, and attached a draft copy of the Companies' complaint and requested an opportunity to discuss with Mr. Cook and FINRA's Office of General Counsel their concerns about the way in which they were treated by FINRA.

98.     Around the same time as the November 21st Letter, the Companies also requested that the FINRA Office of Ombudsman (the "Ombudsman") investigate the allegations giving rise to this Complaint. According to FINRA's website, the Ombudsman is "an independent, neutral, confidential, and informal source of assistance [designed] to provide a forum for individuals who interact with FINRA to voice concerns of potentially unfair FINRA practices and treatment."[3] FINRA advertises that the Ombudsman's role is neutral and is to "advocate for [a] fair FINRA

---

[3] *See* https://www.finra.org/about/office-ombuds (last accessed Jan. 15, 2026).

process and fair administration of those processes."[4]

99.     On November 29, 2025, the Companies' legal counsel received an emailed response from Robert Colby, Chief Legal Officer of FINRA, indicating that in response to the Companies' November 21st Letter, Mr. Colby would be available for a virtual meeting in early December to discuss the allegations giving rise to this Complaint. Thereafter, on or about December 11, 2025, a zoom meeting was scheduled with Mr. Colby and representatives of the Companies.

100.     On December 17, 2025, the Companies and their legal counsel participated in a zoom meeting with Mr. Colby, Emma Jones, Associate General Counsel at FINRA, and Tim Mountz, Chief Litigation Officer at FINRA. During the call, Mr. Colby thanked the Companies for bringing the allegations in this Complaint to his attention rather than immediately filing this Complaint in court. Mr. Colby stated that this demonstrated "good faith" on the Companies' part. Mr. Colby further advised that FINRA considered the allegations serious and would investigate the allegations giving rise to this Complaint, and after that investigation was concluded, the Companies could expect to hear from FINRA to discuss the allegations further.

101.     On December 22, 2025, Mr. Mountz emailed the Companies' legal counsel and advised that in light of the discussions with Mr. Colby, Mr. Mountz and Ms. Jones on December 17, 2025, Mr. Colby's office had unilaterally instructed the Ombudsman to terminate its investigation of the allegations in this Complaint.

102.     On January 12, 2026, the Companies' legal counsel had a call with Jeff Fauci and two other attorneys in FINRA's Enforcement Division. These Enforcement attorneys in no way responded to the serious allegations in this Complaint; instead, Mr. Fauci informed the Companies'

---

[4] *See* https://www.finra.org/about/office-ombuds/ombuds-neutrality (last accessed Jan. 15, 2026).

27

legal counsel that they had not read the draft of this Complaint that was sent to Mr. Cook, they were not familiar with the allegations asserted by the Companies in this Complaint, and were not prepared to discuss those allegations or a resolution but instead threatened that the Companies were required to pay sanctions in an amount that was at least four (4) times the sanctions recommended under the FINRA Sanctions Guidelines, and if the Companies did not agree, FINRA's Enforcement Division would file a complaint on or after Friday, January 16, 2025, and thereby commence an enforcement proceeding against the Companies. It was obvious from this call that not only had Mr. Fauci and his colleagues at FINRA not read the Complaint, but they were not even in a position to discuss the allegations in this Complaint, which was the exact opposite of what Mr. Colby and Mr. Mountz represented would happen following the Office of General Counsel's investigation of the allegations in this Complaint.

103. On January 13 and 14, 2026, the Companies' legal counsel sent multiple emails to Mr. Colby and Mr. Mountz, requesting another telephone call to discuss the allegations in this Complaint, the Office of General Counsel's internal investigation, and the lack of any substantive response thereto. None agreed to a call.

104. Also on January 14, the Companies sent an email to Mr. Cook requesting an opportunity to discuss the allegations in this Complaint, FINRA's internal investigation, and a potential resolution; however, Mr. Cook, too, ignored the Companies' requests.

105. It is now clear that on December 17, 2025, FINRA, through Mr. Colby, Mr. Mountz and Ms. Jones, lied to the Companies about FINRA's intentions in responding to the draft of this Complaint in order to provide FINRA's Enforcement Division sufficient time to draft and file an enforcement complaint against the Companies in retaliation for asserting their rights and complaining about FINRA's abusive and unlawful conduct. Even worse, FINRA engaged in this

28

tactic while also unilaterally instructing the Ombudsman, a self-proclaimed "neutral," not to continue its own independent investigation in a blatant attempt to avoid the truth of FINRA's unlawful actions being exposed.

**CLAIMS FOR RELIEF**

**Count 1**
*Declaratory Judgment*

106. The foregoing allegations are repeated as if fully set forth herein.

107. An actual controversy exists concerning whether FINRA may (a) influence or dictate Nasdaq membership outcomes, or (b) characterize the Companies as "disqualified" to Nasdaq in a manner that drives membership or listing decisions.

108. The SEC-approved Rule 17d-2 Plans allocate to Nasdaq the authority for Nasdaq membership and listing determinations and state that "FINRA shall not review the membership application … [and] shall not review applications … to request a change in the rights or status" of Nasdaq members.

109. FINRA exceeded its delegated authority by (i) telling the Companies on July 3, 2024, that FINRA had the authority to influence Nasdaq's membership decisions and that Nasdaq would deny the Companies' applications if FINRA "recommended" their denial; (ii) telling Nasdaq earlier in 2024 that Boustead was disqualified due to a "regulatory matter," which caused Nasdaq to refuse regulatory approvals; and (iii) threatening reportable denials unless the Companies withdrew.

110. The Companies seek a declaration that such conduct is ultra vires and an injunction barring FINRA from: (i) asserting authority to approve/deny Nasdaq membership; (ii) making or transmitting "disqualification" statements to Nasdaq absent a lawful basis within FINRA's remit; and (iii) coercing application withdrawals with threats of reportable denials.

29

**Count 2**
*Tortious Interference with Prospective Economic Advantage*

111.    The foregoing allegations are repeated as if fully set forth herein.

112.    The Companies maintained ongoing, identifiable business expectancies with IPO issuers and had a pipeline of prospective issuers for Nasdaq listings.

113.    FINRA knew of these expectancies, for example, through its Corporate Finance Department's no objection letters and communications with Nasdaq and the Companies.

114.    FINRA:

   a.  Told Nasdaq in early 2024 that Boustead faced a "regulatory matter," which Nasdaq treated as a disqualification;

   b.  Told the Companies that it had ultimate approval power and intended to object to their admittance into Nasdaq, prompting the Companies to withdraw their waive-in applications;

   c.  In mid-2025, communicated with Nasdaq concerning Boustead's resubmitted application, leading to a preliminary denial; and

   d.  In late 2025, instructed NYSE to deny Sutter's limited underwriting member application.

115.    FINRA's conduct was independently wrongful because it violated the SEC 17d-2 Plans' allocation of regulatory responsibilities and involved false statements to Nasdaq about disqualification.

116.    FINRA's conduct was without justification because FINRA lacked authority under the SEC 17d-2 Plans to influence or determine Nasdaq membership and knowingly mischaracterized the Companies' statuses to Nasdaq.

117.    But for FINRA's conduct, the Companies' expectancies would have ripened into

IPO underwriting revenue. Specific lost fees include $1 million in lost revenue from the Metros IPO and additional offerings, with total losses exceeding $5 million.

### Count 3
### *Tortious Interference with Contract*

118. The foregoing allegations are repeated as if fully set forth herein.

119. The Companies had valid contracts with its clients to serve as an underwriter, contingent only on exchange approval, as referenced in paragraph 73 above.

120. FINRA knew of these contracts, for example, through its Corporate Finance Department's no objection letters.

121. FINRA intentionally and unjustifiably induced Nasdaq to withhold approval by falsely asserting a "regulatory matter" and later by asserting authority to force denial/withdrawal, which prevented performance and caused termination.

122. As a result of FINRA's interference, the Companies suffered damages, including lost underwriting fees and reputational harm.

### Count 4
### *Fraud & Fraudulent Concealment*

123. The foregoing allegations are repeated as if fully set forth herein.

124. On July 3, 2024, during a conference call with the Companies initiated from FINRA's Chicago office, FINRA, through its authorized agent Monti, stated that:

   a. Nasdaq is deferring all waive-in decisions to FINRA

   b. FINRA has ultimately authority to approve or deny those decisions

   c. FINRA intends to object, and

   d. If the Companies do not withdraw their waive-in applications, Nasdaq will deny them and that denial will be a reportable event.

125. Each of these statements was false when made, and FINRA knew these statements were false when FINRA made them.

126. FINRA did not disclose its 17d-2 Plans allocating regulatory responsibilities with Nasdaq that expressly forbade FINRA from reviewing Nasdaq membership applications.

127. FINRA knew the SEC-approved 17d-2 Plan reserved membership decisions to Nasdaq and that FINRA's role was administrative only, as later confirmed by Nasdaq.

128. FINRA made the statements to induce the Companies to withdraw their applications and to pressure settlement leverage in the unrelated enforcement matter.

129. The Companies reasonably relied on FINRA's statements in withdrawing their waive-in membership applications to avoid a reportable denial.

130. As a result of their reliance on FINRA's false statements and their withdrawal of their waive-in applications, the Companies lost specific offerings and millions in revenue they would otherwise have earned.

131. FINRA concealed material facts – namely, the SEC's allocation of regulatory responsibilities and Nasdaq's retention of sole authority for membership decisions – despite a duty to speak created by (i) partial representations on the same subject and (ii) superior knowledge of the Rule 17d-2 Plans in the face of known reliance.

### Count 5
### *Negligent Misrepresentation*

132. The foregoing allegations are repeated as if fully set forth herein.

133. In the course of its business and in response to the Companies' waive-in applications, FINRA supplied information for the guidance of the Companies' in a business transaction (Nasdaq membership) by stating FINRA had ultimate authority and that Nasdaq would deny the applications if FINRA so recommended.

134.    FINRA failed to exercise reasonable care in obtaining and/or communicating that information because the Rule 17d-2 Plans expressly reserve membership decisions to Nasdaq and forbid FINRA from reviewing such applications.

135.    FINRA intended and expected the Companies to rely on its statements to decide whether to continue or withdraw their applications.

136.    The Companies justifiably relied on FINRA's statements by withdrawing and by foregoing engagements, suffering pecuniary loss.

### JURY DEMAND

Plaintiffs request a jury trial on all issues so triable.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs request relief against Defendant as follows:

A.    On the First Cause of Action, for a declaration;

B.    On the Second, Third, Fourth, and Fifth Causes of Action, for damages against Defendant in an amount to be proven at trial, in excess of $75,000.00;

C.    On the Second, Third, and Fourth Causes of Action, for punitive damages;

D.    For attorneys' fees and costs to the fullest extent permitted by law;

E.    For prejudgment and post-judgment interest as allowed by law; and

F.    For such other and further relief as this Court deems just and proper.

**Dated**:  January 15, 2026          Respectfully submitted,

                                      **MICHAEL BEST & FRIEDRICH LLP**

                                      */s/ James Fieweger*
                                      James Fieweger (ARDC# 6206915)
                                      444 W. Lake Street, Suite 3200
                                      Chicago, IL 60606
                                      Telephone: (312) 596-5849
                                      Email: jpfieweger@michaelbest.com

                                      Richard F. Ensor (*pro hac application forthcoming*)
                                      650 S. Main St., Suite 500
                                      Salt Lake City, UT 84101
                                      Telephone: (385) 695-6450
                                      Email:  rfensor@michaelbest.com

                                      Daniel Jozwiak (*pro hac application forthcoming*)
                                      675 15th Street, Suite 2000
                                      Denver, CO 80202
                                      Telephone: (720) 240-9515
                                      Email:  daniel.jozwiak@michaelbest.com

                                      *Counsel for Plaintiffs Boustead Securities,*
                                      *LLC and Sutter Securities, Inc.*