**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BOUSTEAD SECURITIES, LLC, and SUTTER SECURITIES, INC., | ) | |
| Plaintiffs, | ) | |
| v. | ) | 26 C 490 |
| FINANCIAL INDUSTRY REGULATORY AUTHORITY, INC., | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiffs Boustead Securities, LLC ("Boustead") and Sutter Securities, Inc. ("Sutter") are broker-dealers and members of Defendant Financial Industry Regulatory Authority, Inc. ("FINRA"). Plaintiffs allege that FINRA exceeded its delegated regulatory authority by interfering with their applications to become members of the Nasdaq Stock Market LLC ("Nasdaq") and the New York Stock Exchange ("NYSE"). Before the Court is FINRA's motion to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the following reasons, the motion is granted.

## BACKGROUND

The following facts come from the amended complaint and are presumed true for purposes of this motion. All reasonable inferences are drawn in Plaintiffs' favor.

Boustead and Sutter are California-based broker-dealers and FINRA members in good standing that underwrite initial public offerings ("IPOs"). FINRA is a private Delaware corporation and self-regulatory organization ("SRO") that regulates broker-dealers under the Securities Exchange Act of 1934 (the "Exchange Act"). In 2021, and again in July 2024, the Securities and Exchange Commission ("SEC") approved plans under SEC Rule 17d-2 allocating regulatory responsibilities among FINRA, Nasdaq, and Nasdaq BX, Inc. for their common members (the "17d-2 Plans"). FINRA assumed certain examination and enforcement responsibilities under the 17d-2 Plans, but the Plans also provide that "FINRA shall not review the membership application" of a broker-dealer to determine whether it meets Nasdaq's membership requirements. Dkt. # 31, ¶¶ 19–20.

Beginning in August 2022, FINRA's Department of Enforcement investigated Plaintiffs through staff members Jena Levin and Miki Tesija.

In February 2024, a Nasdaq official told Boustead that Nasdaq would not allow a client's IPO to close with Boustead as underwriter because of a "regulatory matter" involving Boustead. *Id.* ¶¶ 30, 33. On March 4, 2024, the same official told Boustead that "someone at FINRA" had contacted Nasdaq about the matter, and that Nasdaq would not approve any IPO underwritten by Boustead until the matter was resolved. *Id.* ¶ 37. FINRA's Ombudsman later told Boustead it was not aware of any such matter, and FINRA's Corporate Finance Department continued to issue "no objection" letters clearing Boustead to underwrite IPOs. *Id.* ¶¶ 32, 40, 43. Boustead ultimately

terminated its engagement with that client, losing more than $1 million in commissions. Plaintiffs allege, on information and belief, that Levin, Tesija, or another member of the Enforcement Department contacted Nasdaq because Plaintiffs would not settle the investigation on FINRA's terms.

When Nasdaq began requiring IPO underwriters to become Nasdaq members, Sutter and Boustead applied for "waive-in" limited underwriting membership in April and June 2024, respectively. *Id.* ¶¶ 46, 49. In June 2024, Edward Monti, a principal analyst in FINRA's Membership Application Program, informed Plaintiffs that FINRA was "reviewing" their applications and asked them to answer specific questions, which they did. *Id.* ¶¶ 50–51. On a July 3, 2024 call, Monti told Plaintiffs that Nasdaq was deferring all waive-in decisions to FINRA, that FINRA had "sole and ultimate authority" to approve or deny the applications, that FINRA intended to object, and that Nasdaq agreed to deny the applications if FINRA recommended denial. *Id.* ¶ 54. Monti added that if Plaintiffs did not withdraw, the denial would be a disclosable event on their public records that would significantly affect their business. No one at FINRA mentioned the 17d-2 Plans. Relying on those statements, Plaintiffs withdrew their applications.

Sutter reapplied in February 2025, and FINRA again requested documents and information. In June 2025, Nasdaq representatives told Sutter that FINRA's involvement in the process was administrative and that Nasdaq retained sole authority to approve or deny waive-in applications. Nasdaq approved Sutter's application on

June 26, 2025. Boustead reapplied in July 2025, but Nasdaq made a preliminary determination to reject its application and declined to comment on any communications with FINRA. Plaintiffs allege, on information and belief, that FINRA's Enforcement Department staff influenced that decision.

Sutter also applied for limited underwriting membership with NYSE in August 2025. In October 2025, NYSE told Sutter that "[a]fter FINRA and NYSE Regulation's review" of the application, it was unable to issue a no objection, and it recommended that Sutter withdraw the application. *Id.* ¶ 88. NYSE later explained that its decision rested on Sutter's "open regulatory matters," including the FINRA investigation conducted by Levin and Tesija, and that it communicated with "the FINRA Enforcement team handling the specific FINRA matter." *Id.* ¶¶ 90–91. Plaintiffs allege losses exceeding $5 million.

After FINRA moved to dismiss their original complaint, Plaintiffs filed the operative amended complaint. The amended complaint asserts claims for a declaratory judgment (Count I), tortious interference with prospective economic advantage (Count II), tortious interference with contract (Count III), fraud and fraudulent concealment (Count IV), and negligent misrepresentation (Count V). Count I seeks a declaration that FINRA's conduct was *ultra vires*[1] under the 17d-2 Plans and an injunction barring FINRA from asserting authority over Nasdaq membership, while

[1] The term *ultra vires* means "unauthorized; beyond the scope of power allowed or granted by a corporate charter or law." *Ogden Plaza Garage Co. v. First Am. Title Ins.*, 2014 WL 6704366, at *1 n.1 (N.D. Ill. 2014) (quotation omitted).

Counts II through V seek damages. FINRA now moves to dismiss the amended complaint under Rules 12(b)(1) and 12(b)(6).[2]

## DISCUSSION

FINRA advances three independent grounds for dismissal: (1) the Exchange Act's statutory review framework deprives the Court of jurisdiction over Plaintiffs' claims; (2) FINRA is absolutely immune from suit for the conduct alleged; and (3) the Exchange Act preempts Plaintiffs' state-law claims. The Court starts with jurisdiction and addresses FINRA's immunity defense in the alternative.

### I. Jurisdiction

The Exchange Act provides that when an SRO denies an applicant membership, the SEC may review the decision and affirm, modify, or set it aside, and a person aggrieved by the SEC's final order may petition a federal court of appeals. 15 U.S.C. §§ 78s(d)–(f), 78y(a)(1). The SEC may also "censure or impose limitations upon the activities, functions, and operations of" an SRO that violates the Exchange Act, the rules or regulations thereunder, or its own rules. *Id.* § 78s(h)(1). In *Citadel Securities, LLC v. Chicago Board Options Exchange, Inc.*, exchange members sued several

[2] A Rule 12(b)(1) motion challenges the Court's subject matter jurisdiction, while a Rule 12(b)(6) motion tests whether the complaint states a facially plausible claim. *Derfus v. City of Chicago*, 42 F. Supp. 3d 888, 893 (N.D. Ill. 2014) (citations omitted). The parties do not dispute which rule governs FINRA's arguments. In any event, the distinction does not affect the Court's analysis and ruling. Under either rule, the Court accepts well-pleaded facts as true and draws all reasonable inferences in Plaintiffs' favor. *Id.* Dismissal based on an affirmative defense is appropriate when the complaint itself sets forth everything necessary to satisfy it. *See Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014).

exchanges in state court to recover fees allegedly charged in violation of the exchanges' own rules. 808 F.3d 694, 697–98 (7th Cir. 2015). The Seventh Circuit affirmed dismissal for failure to exhaust, and it declined to excuse exhaustion even though there was "no obvious path to the monetary compensation plaintiffs [sought]," because the plaintiffs had made no attempt to bring the matter before the SEC and had not shown that doing so would be "clearly futile." *Id*. at 699–700.

Plaintiffs' principal response is that the framework does not apply because they challenge FINRA's own *ultra vires* conduct rather than any decision by Nasdaq or NYSE, and because no final SRO decision exists to review. *Citadel* forecloses the first part of that argument. In *Citadel*, the plaintiffs sought to "import the immunity analysis" into the exhaustion inquiry, arguing in effect that the challenged conduct was private rather than regulatory. 808 F.3d at 699. The Seventh Circuit rejected the move, explaining that while immunity turns on the nature of the defendant's action, "exhaustion relates to the reach of the SEC's authority to review the action," and "the exhaustion inquiry is jurisdictional rather than content-based." *Id*. at 699–700. "What matters for exhaustion is not the nature of defendants' action, but whether the action involves defendants' own rules pursuant to the Exchange Act." *Id*. at 700.

Measured by that standard, each of Plaintiffs' claims falls within the SEC's reach, because each is built on the 17d-2 Plans, the SEC-approved agreements that allocate regulatory responsibility between FINRA and Nasdaq. Count I seeks a declaration that FINRA's role in exchange membership determinations is *ultra vires*

under the Plans, along with an injunction limiting FINRA's future involvement in those determinations. Plaintiffs themselves describe this claim as presenting "a question of federal regulatory law that turns on the straightforward meaning of the 17d-2 Plans' prohibition." Dkt. # 44, at 11–12.

The damages counts rest on the same premise. Count II alleges that FINRA's conduct was "independently wrongful because it violated the SEC 17d-2 Plans' allocation of regulatory responsibilities" and unjustified because "FINRA lacked authority under the SEC 17d-2 Plans." Dkt. # 31, ¶¶ 107–08. Count III alleges that FINRA "unjustifiably induced Nasdaq to withhold approval" by asserting authority it lacked. *Id.* ¶ 113. Count IV alleges that FINRA concealed the 17d-2 Plans and knew they "reserved membership decisions to Nasdaq." *Id.* ¶¶ 118–19. And Count V alleges that FINRA failed to exercise reasonable care because the Plans "expressly reserve membership decisions to Nasdaq." *Id.* ¶ 126.

Plaintiffs' own jurisdictional allegations confirm the point: they invoke federal-question jurisdiction because "this action requires construction of" the 17d-2 Plans. *Id.* ¶ 16. That construction is the SEC's province. The SEC approves the Plans and may act against an SRO that fails to comply with them. 15 U.S.C. §§ 78q(d), 78s(h)(1); 17 C.F.R. § 240.17d-2(c). Whether FINRA exceeded its authority under the Plans is therefore a question for the SEC in the first instance. Count I makes the point most

clearly, because it seeks prospective limits on FINRA's activities, precisely the relief the SEC may impose.[3]

Nor does the absence of a final SRO decision excuse Plaintiffs' failure to exhaust. Plaintiffs contend that FINRA's misstatements induced them to withdraw their applications before any decision issued. But the statutory scheme was built for the injury Plaintiffs allege: the failure to obtain exchange membership. An exchange's denial of membership is reviewable by the SEC, which asks whether the grounds for the denial exist in fact and accord with the exchange's rules, and the SEC's decision is in turn reviewable by a court of appeals. 15 U.S.C. §§ 78s(d), (f), 78y(a)(1). Any role FINRA played in a denial, including its alleged disregard of the 17d-2 Plans, could have been raised in that process. Plaintiffs, however, withdrew their 2024 applications and do not allege that they pursued Boustead's 2025 Nasdaq application or Sutter's NYSE application to a final decision or sought review of either. Whatever prompted those choices, the review process remained available.

The unavailability of damages does not make that process futile. The absence of a damages remedy reflects Congress's design, not a gap that permits litigants to bypass the statutory scheme. As the D.C. Circuit explained in rejecting common-law claims

---

[3] Count I would fail in any event. Count I asks the Court to declare that FINRA's conduct is "not subject to regulatory immunity or the Exchange Act's statutory review framework." Dkt. # 31, ¶ 102. Because Counts II through V are also dismissed in the alternative for the reasons discussed herein, Count I cannot survive as a freestanding claim for relief. *See Sieving v. Cont'l Cas.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021) (concluding that declaratory judgment is a form of relief, not an independent cause of action).

by applicants whose qualification exams the National Association of Securities Dealers[4] had misscored, "[b]y specifically adopting an appeals process which does not provide monetary relief, Congress has displaced claims for relief based on state common law." *In re Series 7 Broker Qualification Exam Scoring Litig.*, 548 F.3d 110, 114 (D.C. Cir. 2008). The later history of Citadel is not to the contrary. After the Seventh Circuit's decision, the SEC declined to entertain the Citadel plaintiffs' damages petition, and the Seventh Circuit upheld that decision as reasonable. *Chi. Bd. Options Exch., Inc. v. SEC*, 889 F.3d 837, 841–42 (7th Cir. 2018). But that petition was, as the SEC characterized it, a private "billing dispute" over the repayment of fees; it did not seek relief under Section 78s(d) or allege any limitation of access to services. *Id*. Plaintiffs' dispute, by contrast, arises from the membership application process that Sections 78s(d) and (f) expressly subject to SEC review. Plaintiffs have not shown that resort to that process would have been futile.

Finally, Plaintiffs' reliance on *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and its progeny is misplaced. The *Thunder Basin* factors confirm, rather than undermine, that Congress channeled these claims to the SEC. *See Thunder Basin*, 510 U.S. at 212–13; *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 186 (2023). First, meaningful review was available to Plaintiffs, even if not in the form they preferred. Second, the claims are not wholly collateral to the statutory scheme, because they depend on the

[4] The National Association of Securities Dealers is now known as FINRA.

scope of FINRA's authority under the 17d-2 Plans. Third, that question lies at the heart of the SEC's expertise. *See Hurry v. Fin. Indus. Regul. Auth., Inc.*, 2026 WL 1660421, at *3–4 (D. Utah 2026). Nor do Plaintiffs raise the kind of structural challenge that *Axon* permitted to proceed in district court; they dispute how FINRA exercised authority allocated by an SEC order, not the existence or structure of an agency. *See Axon*, 598 U.S. at 188–89.

In sum, the Court lacks subject-matter jurisdiction over Plaintiffs' claims, FINRA's motion to dismiss is granted, and Plaintiffs' amended complaint must be dismissed. Although the dismissal is without prejudice, FINRA's immunity defense, addressed below, renders any further amendment futile.

## II. Absolute Immunity

Because SROs perform regulatory functions that would otherwise fall to a government agency, they "are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011); *see also D'Alessio v. N.Y. Stock Exch., Inc.*, 258 F.3d 93, 105–06 (2d Cir. 2001); *In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*, 390 F. Supp. 3d 916, 929 (N.D. Ill. 2019), *aff'd sub nom. Barry v. Cboe Glob. Markets, Inc.*, 42 F.4th 619 (7th Cir. 2022). The SRO bears the burden of establishing immunity. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007). In making an immunity determination, courts apply a functional test that focuses on "the nature of the function

performed, not the identity of the actor who performed it." *Id*. (citation omitted). That test is objective: immunity "depends only on whether specific acts and forbearances were incident to the exercise of regulatory power, and not on the propriety of those actions or inactions." *Id*. at 98. The Court therefore looks "to the alleged misconduct of the [SRO] as detailed in the complaint," not to how the claims are labeled. *D'Alessio*, 258 F.3d at 105–06. Where the conduct is regulatory, the SRO's motive is irrelevant, and there is no exception for fraud. *NYSE Specialists*, 503 F.3d at 95–96, 101.

Plaintiffs argue that *Galette v. New Jersey Transit Corp.*, 607 U.S. 509 (2026), forecloses immunity for a legally separate private corporation like FINRA. It does not. *Galette* held that New Jersey Transit is not an arm of the State and therefore does not share the State's sovereign immunity, which is "personal" to the State. *Id.* at 515, 519. SRO immunity does not depend on that kind of status. To be sure, courts justifying the doctrine have noted that, absent self-regulation, an SRO's functions would be performed by the SEC, "an agency which is accorded sovereign immunity from all suits for money damages." *Series 7*, 548 F.3d at 114 (quoting *DL Cap. Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d 93, 97 (2d Cir. 2005)). But the doctrine has never rested on the premise that an SRO is an arm of the United States. *See Barbara v. N.Y. Stock Exch., Inc.*, 99 F.3d 49, 59 (2d Cir. 1996) (exchange "does not share in the SEC's sovereign immunity"), *abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374 (2016). Instead, the immunity attaches to the delegated regulatory function and rests on the structure Congress enacted. *Series 7*, 548

F.3d at 114–15. *Galette*, which does not mention SROs, functional immunity, or the Exchange Act, does not disturb that framework. And because immunity follows the function rather than the entity's status, FINRA's position that it is not a state actor is consistent with that framework.

The conduct alleged falls within FINRA's regulatory functions. Plaintiffs' claims rest on two categories of conduct. The first is FINRA Enforcement's communications with Nasdaq and NYSE about its investigation of Plaintiffs. Communicating with fellow regulators about an ongoing investigation of one's own members is a core regulatory function. In *D'Alessio*, the Second Circuit held the NYSE immune from fraud and misrepresentation claims alleging that it gave the SEC and federal prosecutors "false, misleading and inaccurate information" about the plaintiff, because providing that information was part of the NYSE's delegated referral function. 258 F.3d at 98, 106. The same reasoning applies here. Plaintiffs' allegations that the reports were false and intended to extract a settlement do not change the analysis, because the immunity inquiry turns on the function performed, not on the accuracy of the information or the motive behind it.

The second category of conduct consists of Monti's statements during FINRA's review of Plaintiffs' Nasdaq applications. By Plaintiffs' own account, FINRA was reviewing the applications, requesting information from Plaintiffs, and communicating with Nasdaq about them. Screening applicants for admission to a regulated market is a quintessential regulatory function.

Plaintiffs' core theory is that FINRA's conduct was *ultra vires*, and therefore outside the scope of immunity, because the 17d-2 Plans provide that FINRA "shall not review" Nasdaq membership applications. Dkt. # 44, at 23. That theory misapprehends the objective test. Whether FINRA exceeded the Plans' allocation of responsibility goes to the propriety of its conduct, not to whether that conduct was incident to the exercise of regulatory power. SROs are "absolutely immune from suit for the improper performance of regulatory, adjudicatory, or prosecutorial duties delegated by the SEC," *Series* 7, 548 F.3d at 114, and if immunity "only attache[d] to those who follow the law, the immunity doctrine would be effectively subverted," *NYSE Specialists*, 503 F.3d at 98. Plaintiffs' agency argument fails for the same reason. FINRA claims immunity in its own right, based on the functions it performed, not derivatively through Nasdaq.

Accordingly, even if the Court had jurisdiction over Counts II through V, FINRA would be absolutely immune from them. And because that immunity arises from the regulatory character of the conduct Plaintiffs challenge rather than any deficiency in how it is pleaded, no amendment could cure it. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519–20 (7th Cir. 2015).[5]

---

[5] The Court does not reach FINRA's argument that the Exchange Act preempts Plaintiffs' state-law claims. The Court notes, however, that the D.C. Circuit has held that the Exchange Act preempts common-law damages claims arising from an SRO's regulatory duties, *Series 7*, 548 F.3d at 113–15, and that the Seventh Circuit has reached the same conclusion under the comparable commodities scheme, notwithstanding a savings clause and an "*ultra vires*" label, *Effex Cap., LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 893–96 (7th Cir. 2019).

## CONCLUSION

For the reasons stated above, FINRA's Motion to Dismiss [36] is granted. The amended complaint is dismissed without prejudice for lack of subject matter jurisdiction. Civil case terminated.

It is so ordered.

Dated: October 13, 2026

Charles P. Kocoras
United States District Judge